IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| MICHAEL I. FORD, | § | |
| TDCJ #557415, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-05-0471 |
| | § | |
| ARTHUR H. VELASQUEZ, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

State inmate Michael I. Ford (TDCJ #557415) has filed this lawsuit under 42 U.S.C. § 1983, alleging violations of his civil rights.  He proceeds *pro se* and he has been granted leave to proceed *in forma pauperis*.  At the Court's request, Ford has provided a more definite statement of his claims.  (Doc. # 10).  Most of the defendants have been served and have filed an answer.  These defendants have filed a joint motion for summary judgment.  (Doc. # 31).  Ford has filed more than one response, including objections, an affidavit, and a cross-motion for summary judgment.  (Docs. # 32, # 33, # 34, # 35). After reviewing all of the pleadings, and the applicable law, the Court grants the defendants' motion and dismisses this case for reasons that follow.[1]

---

[1]   On October 25, 2007, this case was reassigned to United States District Judge Melinda Harmon pursuant to General Order 2007-10.  The case is being handled by the undersigned by agreement of the judges.

## I.   __BACKGROUND__

Ford is currently in custody at the Michael Unit in Tennessee Colony, Texas.  The incident that forms the basis of Ford's complaint occurred at the Darrington Unit, where Ford was formerly assigned.  Ford sues several TDCJ employees assigned to the Darrington Unit facility, including:   Senior Warden Arthur H. Velasquez; Assistant Warden James W. Mossbarger; Grievance Investigator Julio Rodriguez; Captain Lawrence L. Dawson; Lieutenant Hector G. Delarosa; Lieutenant Carlos M. Sanders; Investigator Laurence P. Ching; Captain Philip S. Rocker; Sergeant Ahmed K. Boateng; Officer Christopher A. Barbary; and Officer Tiffany L. Hill.[2]  Ford alleges that these defendants failed to adequately investigate his claims of "life endangerment" and failed to protect him from harm in connection with an altercation that occurred on or about May 11, 2005.

Ford was reportedly assaulted by another inmate at the Darrington Unit on May 11, 2005.  On that date, Officer Barbary observed Ford in his cell, saw that Ford was bleeding, and summoned a lieutenant.  The lieutenant escorted Ford to the unit infirmary, where Ford was treated for a swollen right eye and bruises on his face.  Ford alleged that another inmate, identified as Robert Moreno, entered Ford's cell (cell B-2-06) and assaulted him with his fists.  Ford reportedly bit Moreno on the left side of his chest while defending himself.  On May 12, 2005, Ford was transferred to the University of Texas Medical Branch ("UTMB")

---

[2]    Of these defendants, all but Officer Barbary, who is no longer employed by TDCJ, have filed an answer.

2

John Sealy Hospital in Galveston.  He was diagnosed with a right orbital fracture.  Ford returned to the Darrington Unit the next day on May 13, 2005.

An investigation at the Darrington Unit revealed that Moreno, who was assigned to a nearby cell (cell B-2-07), had a red mark between his left arm and left pectoral area.  The investigation further revealed that Ford owed money to other inmates at the Darrington Unit facility and that Ford wanted to transfer from the unit to escape his debts.  Although investigators were unable to determine whether Moreno had any specific motive to assault Ford, the Darrington Unit Classification Committee recommended transferring Ford to another facility.  Ford was transferred to the Michael Unit on June 15, 2005, where he remains in custody.[3]

In his civil rights complaint, which is dated August 17, 2005, Ford complains that the defendants failed to protect him from harm in violation of his Eighth Amendment rights.  Specifically, Ford claims that he alerted Senior Warden Velasquez, Assistant Warden Mossbarger, Grievance Investigator Rodriguez, Captain Dawson, Lieutenant Delarosa, Lieutenant Sanders, Investigator Ching, Captain Rocker, and Sergeant Boateng that his life was in danger, prior to the May 11, 205 assault, but that these officials failed to adequately investigate his claims of endangerment.  Ford claims further that Officer Barbary and Officer Hill were in charge of the cell doors on his block the day the assault occurred, but that they

---

[3]   The record reflects that Ford is presently incarcerated fore three convictions entered against him in 1990 for burglary of a vehicle, burglary of a habitation, and murder.  (Doc. # 10, ¶ 30).  Ford was also sentenced in 2002 escape from a penal institution.  (*Id.*).  He is serving a total of ninety-five years in prison as a result of these convictions.  (Doc. # 31, Exhibit B at 15).

either failed to prevent the attack or allowed the assault to occur.  Ford seeks nominal, compensatory, and punitive damages from all of the defendants for the injuries he suffered. The defendants have filed a joint motion for summary judgment, arguing that Ford is not entitled to relief.  The parties' contentions are addressed below under the governing standard of review.

## II.    STANDARD OF REVIEW

The complaint in this case is governed by the Prison Litigation Reform Act (the "PLRA"), which mandates the dismissal of a prisoner's civil rights complaint under the following circumstances.  Upon initial screening of a prisoner civil rights complaint, the PLRA requires a district court to scrutinize the claims and dismiss the complaint, in whole or in part, if it determines that the complaint "is frivolous, malicious, or fails to state a claim upon which relief may be granted;" or "seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A(b).  A reviewing court may dismiss a complaint for these same reasons "at any time" where a party proceeds *in forma pauperis*. 28 U.S.C. § 1915(e)(2)(B) (mandating dismissal where the complaint is "frivolous or malicious," "fails to state a claim upon which relief may be granted," or "seeks monetary relief from a defendant who is immune from such relief").  The PLRA also provides that the court "shall on its own motion or on the motion of a party dismiss an action" if it is satisfied that the complaint is "frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." 42 U.S.C. § 1997e(c).

4

The defendants have filed a motion for summary judgment, arguing that the plaintiff's claims fail as a matter of law.  The plaintiff has filed a cross-motion for summary judgment. Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under Rule 56, a court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The moving party bears the burden to show that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Capitol Indem. Corp. v. United States*, 452 F.3d 428, 430 (5th Cir. 2006).

Once the moving party meets its initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  The nonmovant cannot satisfy this burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  To survive summary judgment, the nonmovant must submit or identify evidence in the record to show the existence of a genuine issue of material fact as to each element of the cause of action. *See Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003) (citation omitted).  Facts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). Where the non-moving party fails to establish "the existence of an element essential to that party's case, and on which that party will bear the burden of

5

proof at trial," no genuine issue of material fact can exist. *Celotex*, 477 U.S. at 322-23; *Whiting v. University of Southern Miss.*, 451 F.3d 339, 345 (5th Cir. 2006).

The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See Morris v. Covan Worldwide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998); *see also Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994) ("Unsworn pleadings, memoranda or the like are not, of course, competent summary judgment evidence."). Likewise, the nonmoving party "cannot satisfy this burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Freeman v. Tex. Dep't of Crim. Justice*, 369 F.3d 854, 860 (5th Cir. 2004) (citations omitted). In the absence of proof, a reviewing court will not assume that the nonmovant could or would prove the necessary facts. *See McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *revised on other grounds upon denial of reh'g*, 70 F.3d 26 (5th Cir. 1995). Although the plaintiff proceeds *pro se*, "the notice afforded by the Rules of Civil Procedure and the local rules" is considered "sufficient" to advise a *pro se* party of his burden in opposing a summary judgment motion. *Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir. 1992).

## III.  DISCUSSION

### A.    Exhaustion of Administrative Remedies

The defendants argue that the complaint in this case is barred from review because Ford failed to comply with the exhaustion requirement found in the PLRA, 42 U.S.C. § 1997e(a), by properly presenting his claims for consideration by prison officials before

6

filing suit.  Under the PLRA, codified as amended at 42 U.S.C. § 1997e(a), an inmate is required to exhaust administrative remedies for all "action[s] . . . brought with respect to prison conditions" before filing a civil rights suit in federal court under 42 U.S.C. § 1983 or "any other Federal law."  The Supreme Court has held repeatedly that § 1997e(a) requires exhaustion of *all* administrative procedures before an inmate can sue in federal court.  *See Booth v. Churner*, 532 U.S. 731, 741 (2001); *see also Porter v. Nussle*, 534 U.S. 516, 532 (2002) (holding that the PLRA requires exhaustion of all claims concerning prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong).

The defendants note that TDCJ has a formal two-step administrative grievance process.  *See Wendell v. Asher*, 162 F.3d 887, 891 (5th Cir. 1998) (outlining the two-step procedure, which at Step 1 entails submitting an administrative grievance at the institutional level followed by a Step 2 appeal if the result is unfavorable).  A Step 1 grievance, which is reviewed by officials at the inmate's assigned facility, must be filed within fifteen days of the alleged incident or challenged event.  *See Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004).  Once an inmate receives a response to his Step 1 grievance, he then has up to ten days to file a Step 2 grievance to appeal an unfavorable result.  *See id.*  Step 2 grievances are reviewed at the state level.  *See id.*  A Texas prisoner must pursue a grievance through both steps to satisfy the exhaustion requirement.  *See id.* (citing  *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001)).

The defendants have provided copies of all grievances filed by Ford within the time frame relevant to the complaint, from January through November of 2005. (Doc. # 31, Exhibit B). The record shows that, prior to filing this lawsuit, Ford filed three step 1 grievances concerning his claim of life endangerment, but only one step 2 grievance. Those grievances, and the response made by prison officials, are summarized below.

On March 29, 2005, Ford filed a step 1 grievance on which he wrote "emergency [sic]" and "life - n - dangerment [sic]" on the front. (Doc. # 31, Exhibit B, at 29-30, Grievance #2005128408). Ford, who was assigned to cell C-3-24 at the time, complained about a dispute with a female officer (Officer Taylor) over the lack of towels in the C-block shower. (*Id.*). Ford claimed that Officer Taylor threatened him, which placed him in fear because she was affiliated with a gang (she was "down with the Crips"). (*Id.*). During the course of his "verbal altercation" with Officer Taylor, Ford claims that he was threatened by an inmate named "Kato" who was housed in cell C-1-03. (*Id.*).

While his initial step 1 grievance was still pending, Ford filed another step 1 grievance on May 5, 2005. (Doc. # 31, Exhibit B, at 10-11, Grievance #2005128408).[4] In this grievance, Ford expressed "concern" about the investigation of his claim of life endangerment involving Officer Taylor. *Id.* at 10. Ford asked for information about the status of the pending investigation and complained that officials had failed to treat his claims

---

[4] The step 1 grievance filed by Ford on March 29, 2005, and the step 1 grievance filed by Ford on May 5, 2005 were both assigned the same number by the grievance office (#2005150848). (Doc. # 31, Exhibit B, at 10-11, 29-30). It appears that this was done because both step 1 grievances concerned Ford's life endangerment claim that arose from the incident with Officer Taylor.

8

properly.  *Id.* at 10-11.  Ford also requested a "unit transfer" away from Texas Syndicate and Mexican Mafia gang members, but he did not mention any particular threat.  *Id.* at 11.

On May 10, 2005, Assistant Warden Mossbarger filed a response to Ford's step 1 grievance about the incident with Officer Taylor.  *Id.* at 30.  Attachments to the grievance reflect that prison officials were treating Ford's claim as one for "emergency life endangerment" and were investigating the threat that Ford reported on March 29, 2005.  (*Id.* at 31-36).  Assistant Warden Mossbarger advised Ford that his claim of life endangerment was being investigated, but that "no evidence" had been found to support his allegations.  *Id.* at 30.  Ford did not file a step 2 grievance to appeal the result.

On May 11, 2005, Ford was assaulted in his cell by Robert Moreno.  Ford filed a step 1 grievance on May 17, 2005, complaining about the assault.  (*Id.* at 3, Grievance #2005158598).  In this grievance, Ford blamed Officer Barbary and Officer Hill for the assault because the door to his cell was opened, which allowed Moreno to enter and attack him.  (*Id.* at 3-4).  Ford reported that Moreno was a Texas Syndicate gang member.  (*Id.*).

On May 23, 2005, Assistant Warden Mossbarger filed a response to Ford's step 1 grievance regarding the assault, advising that his complaint had been forwarded to the Regional Office of Inspector General.  (*Id.* at 4).  On June 1, 2005, Ford filed a step 2 grievance to appeal this result.  (*Id.* at 1).  In this step 2 grievance, Ford complained that officials failed to adequately investigate the initial step 1 grievance that he filed on March 29, 2005, regarding the incident with Officer Taylor, and that they also failed to adequately investigate the second step 1 grievance that he filed about that incident on May 5, 2005.

(*Id.*).  The only allegation made against any specific official was Ford's claim that Captain Dawson ignored a verbal complaint that he made on May 10, 2005.  (*Id.* at 2).

On June 14, 2005, Assistant Warden Mossbarger filed a response to Ford's step 1 grievance concerning his life endangerment investigation.  (*Id.* at 11). Mossbarger noted that the investigation was complete and that Ford's claim had been reviewed by the Unit Classification Committee,  which recommended a transfer.  (*Id.*).  Ford did not file a step 2 grievance to appeal this result.

On June 23, 2005, Assistant Regional Director J.P. Guyton filed a response to the step 2 grievance appeal submitted by Ford on May 23, 2005.  (*Id.* at 2).  In this response, Director Guyton noted that Ford had been transferred to the Michael Unit on June 15, 2005, and that he considered the grievance "resolved" by the unit transfer.  (*Id.*).

As noted above, a Texas inmate must file both a step 1 and step 2 grievance to exhaust the administrative remedy process available at TDCJ.  *See Johnson*, 385 F.3d at 515 (citing *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001)).  A review of the only step 2 grievance filed by Ford shows that he presented a general claim of dissatisfaction with security practices and with the life endangerment investigation that was conducted after he filed his initial grievance about Officer Taylor on March 29, 2005.  (Doc. # 31, Exhibit B, at 1-2).  However, Ford did not present any of the specific allegations against the individual defendants in his lone step 2 grievance.  (*Id.*).  Ford's general allegations were insufficient under the circumstances to put prison officials on notice of the specific claims raised against the individual defendants in this case.  As the Fifth Circuit has observed, "[i]f an inmate

claims that a guard acted improperly, we can assume that the administrators responding to the grievance would want to know — and a prisoner could ordinarily be expected to provide — details regarding who was involved and when the incident occurred, or at least other available information about the incident that would permit an investigation of the matter." *Johnson*, 385 F.3d at 517. Because Ford did not provide details about his claims against the individual defendants in both steps of the administrative grievance process available at TDCJ, he did not present sufficient information to exhaust his administrative remedies with regard to these claims.

The Supreme Court has emphasized that the exhaustion requirement found in the PLRA, 42 U.S.C. § 1997e(a), mandates "proper exhaustion," *Woodford v. Ngo*, 548 U.S. 81, 126 S. Ct. 2378, 2387 (2006), which demands compliance with prison procedural rules.  As the Supreme Court has recognized, "Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter*, 534 U.S. at 524.  By requiring exhaustion of administrative remedies, Congress hoped that "corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation."  *Id.* (citing *Booth*, 532 U.S. at 737).  In addition to filtering out potentially frivolous claims, Congress also believed that internal review would facilitate adjudication of cases ultimately brought to court by giving prison officials an opportunity to develop an administrative record that clarifies the contours of the controversy.  *Id.* (citations omitted).

11

Because § 1997e(a) expressly requires exhaustion, prisoners may not deliberately bypass the administrative process by flouting an institution's procedural rules. *See Woodford*, 126 S. Ct. at 2389-90. By failing to complete the grievance procedure in place at TDCJ by filing a step 1 and step 2 grievance concerning his claims against the individual defendants, Ford bypassed available administrative remedies. *See Carbe v. Lappin*, 492 F.3d 325, 238 (5th Cir. 2007). This violates the PLRA's exhaustion requirement found in § 1997e(a), which mandates exhaustion *before* filing suit. *See Underwood v. Wilson*, 151 F.3d 292, 296 (5th Cir. 1998) (affirming the dismissal even under circumstances that would seem "inefficient"). Ford's failure to properly present his claims against the individual defendants in both steps of the TDCJ grievance process means that he has failed to comply with the exhaustion requirement found in § 1997e(a). Accordingly, the defendants are entitled to summary judgment on Ford's claims against the individual defendants. Alternatively, Ford's complaint fails for other reasons discussed further below.

## B.     Immunity for Official Capacity Claims

All of the defendants are employed by TDCJ, which is a state agency. As employees of the State of Texas, the defendants argue that the Eleventh Amendment to the United States Constitution bars any claim for monetary relief against them in their official capacity. The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Thus, federal court jurisdiction is limited by the Eleventh Amendment

and the principle of sovereign immunity that it embodies.  *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); *Vogt v. Board of Comm'rs, Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002).

Unless expressly waived, the Eleventh Amendment bars an action in federal court by, *inter alia*, a citizen of a state against his or her own state, including a state agency.  *See Martinez v. Texas Dep't of Criminal Justice*, 300 F.3d 567, 574 (5th Cir. 2002).  As an instrumentality of the State of Texas, TDCJ is immune from a suit for money damages under the Eleventh Amendment.  *See Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998).  It is also settled that the Eleventh Amendment bars a recovery of money damages under § 1983 from state employees in their official capacity.  *See Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2001); *Aguilar v. Texas Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998).

In this case, Ford sues the defendants for actions taken during the course of their employment with the State of Texas.  To the extent that Ford seeks monetary damages in this case, the Eleventh Amendment bars his claims against the defendants as state employees.[5] It follows that the defendants are entitled to immunity under the Eleventh Amendment from

---

[5] A narrow exception to Eleventh Amendment immunity exists for suits brought against individuals in their official capacity, as agents of the state or a state entity, where the relief sought is injunctive in nature and prospective in effect.  *See Aguilar*, 160 F.3d at 1054 (citing *Ex parte Young*, 209 U.S. 123 (1980)).  Ford has lodged claims for declaratory and injunctive relief in this case.  Ford's claims for declaratory and injunctive relief are moot, however, because he is no longer in custody at the Darrington Unit facility where the incident occurred and where the defendants are employed.  *See Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (holding that a claim for declaratory and injunctive relief that is based on conditions of confinement is rendered moot upon the prisoner's release or transfer from the facility).  Ford does not otherwise show that he fits within the narrow exception that exits for Eleventh Amendment immunity in this instance.

Ford's claims for money damages against them in their official capacity. Accordingly, the defendants are entitled to summary judgment on this issue.

### C.    Qualified Immunity for Individual Capacity Claims

The defendants content that they are entitled to qualified immunity from Ford's claims against them in their individual capacity. Public officials acting within the scope of their authority generally are shielded from civil liability by the doctrine of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982). "The doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions." *Cozzo v. Tangipahoa Parish Council – President Gov't*, 279 F.3d 273, 284 (5th Cir. 2002) (quoting *Thompson v. Upshur Cty.,* 245 F.3d 447, 456 (5th Cir. 2001)). "The Supreme Court has characterized the doctrine as protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

In assessing qualified immunity, this Court must conduct a bifurcated analysis. *See, e.g., Collins v. Ainsworth,* 382 F.3d 529, 537 (5th Cir. 2004), *cert. denied*, 547 U.S. 1055 (2006). The threshold question has two parts. The initial inquiry asks whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the official's conduct violated a constitutional right. *See Scott v. Harris*, — U.S. —, —, 127 S. Ct. 1769, 1774 (2007) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "If, and only if, the court finds a violation of a constitutional right, 'the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case.'" *Id.* (quoting *Saucier*,

14

533 U.S. at 201).  If the defendant's actions violated a clearly established constitutional right, the final step of the analysis asks whether qualified immunity is appropriate, nevertheless, because the defendant's "actions were objectively reasonable" in light of "law which was clearly established at the time of the disputed action." *Collins,* 382 F.3d at 537 (citations omitted).

The usual summary judgment burden of proof is altered in the case of a qualified immunity defense.  *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)).  An official need only plead his good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law. *Id*. The plaintiff bears the burden of negating the defense and cannot rest on conclusory allegations and assertions, but must demonstrate genuine issues of material fact regarding the reasonableness of the official's conduct. *Id*.

In this instance, the defendants argue that Ford has failed to establish that their actions violated a clearly established constitutional right.  They argue further that, even if a violation occurred, their actions were objectively reasonable under the circumstances.  At the summary judgment stage of this case, a determination whether a constitutional right was violated for purposes of the first prong of the qualified immunity analysis overlaps substantially with a determination whether Ford's claim lacks merit.  Accordingly, the Court first addresses whether Ford has raised a genuine issue of material fact on whether the defendants failed to protect him from harm in violation of the Eighth Amendment.

15

### 1.        Eighth Amendment — Failure to Protect

To establish a failure-to-protect claim under 42 U.S.C. § 1983, a prisoner must show that he has been incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995). To act with deliberate indifference, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Only deliberate indifference will suffice to state a failure-to-protect claim; mere negligence is not sufficient.  *See id.*; *see also Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990) (holding that a negligent failure to protect from harm does not make a claim under 42 U.S.C. § 1983).

Ford alleges that officials failed to protect him from the assault by Moreno because they did not conduct an adequate investigation of a life endangerment claim that he made on March 29, 2005, involving an incident with Officer Taylor, who was supposedly affiliated with a gang known as the Crips.  The record does not clearly show that Ford received a threat from the inmate who attacked him (Moreno) prior to the assault that occurred on May 11, 2005, or that he asserted a need for protection from this individual, who was assigned to a nearby cell, before he was attacked.   Under these circumstances, Ford's general dissatisfaction with the investigation and his claim that the defendants failed to prevent this assault rises only to the level of mere negligence, if anything, and is not sufficient to state a failure-to-protect claim.  *See Farmer*, 511 U.S. at 837; *see also Neals*, 59 F.3d at 533

16

(concluding that allegations amounting to a claim of negligence in the failure-to-protect context did not raise a non-frivolous constitutional claim); *Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990) (holding that a negligent failure to protect from harm does not make a claim under 42 U.S.C. § 1983).

Likewise, the record does not demonstrate that officials failed to investigate Ford's claims of life endangerment or that they deliberately ignored a substantial risk of serious harm.   As outlined above, Ford filed a step 1 grievance that asserted claim of life endangerment on March 29, 2005, in which he reported a threat by Officer Taylor, who was assigned to the "C-line" portion of the unit.  (Doc. # 31, Exhibit B, at 29-30).  Ford does not provide any facts showing that the threats allegedly made by Officer Taylor in March of 2005 were somehow linked to the assault by Moreno on May 11, 2005.  In the step 1 grievance, Ford complained that he was in fear for his safety because Officer Taylor was "down with the Crips," whereas it appears that Moreno is not a Crip, but was instead affiliated with the Texas Syndicate.  (Doc. # 31, Exhibit B, at 3, 29-30).  Nevertheless, Ford insists that prison officials did not take his March 29, 2005 grievance seriously and that they should have protected him from the possibility of harm from any gang member as a result of Taylor's threats.

The record refutes Ford's allegation that officials failed to investigate or address his claim of life endangerment.  Ford's grievance against Officer Taylor was processed the same day that it was received by the grievance office, where it was treated as an "emergency life endangerment" claim and forwarded to a Darrington Unit gang investigator on March 29,

2005.  (*Id.* at 31, 34).  In spite of Ford's contention that his claim presented an emergency, the grievance was not officially classified as an emergency because it involved "fear of staff."  (*Id.* at 31).  In that respect, Ford alleged that he was in fear of Officer Taylor, due to her affiliation with the Crips.  (*Id.*).

The record confirms that officials opened a life endangerment investigation to address Ford's claim that he was in danger from Officer Taylor and from "other Crip inmates" who reportedly threatened him for getting Officer Taylor in trouble.  (Doc. # 31, Exhibit C, at 5).  In the mean time, on April 18, 2005, Ford was removed from his cell in C-line area of the unit, where Officer Taylor was assigned, and transferred to a cell located in another portion of the prison at "B-1."  (Doc. # 31, Exhibit B, at 8).

On May 5, 2005, Ford filed another written grievance to ask about the status of the life endangerment investigation regarding his complaint against Officer Taylor.  (Doc. # 31, Exhibit B, at 10-11).  On that same day, Ford was interviewed by an investigator in the Gang Intelligence Office about his claim concerning Officer Taylor.  Ford provided a written statement to investigators, in which he stated that Officer Taylor threatened him and repeated that she was "down with the Crips[.]"  (Doc. # 31, Exhibit C, at 12).  Ford added that, since filing the step 1 grievance about the March 2005 incident with Officer Taylor, he had received other threats from unspecified inmates ("a dude [sic] goes by Lalo who's [Texas Syndicate]," some "Mexican Mafia gang members named 'Super' and 'Coca,'" and some other "dudes who go by 'D-Town' and 'Danger' [who] are all hispanics" ).  (*Id.* at 13).  After giving this written statement to the gang investigators, Ford was moved from his assigned

18

cell (B-1-13) to a different row (B-2-06). (Doc. # 31, Exhibit B, at 8). Presumably, Ford was moved from his cell on B-1 to a different row (B-2) in order to distance him from the gang members who reportedly threatened him on May 5, 2005.

On May 10, 2005, Ford sent a letter to Senior Warden Velasquez and Sergeant Ching. (Doc. # 31, Exhibit C, at 11). In that letter, Ford complained that he was "jumped" by an unidentified inmate while being escorted to the shower. (*Id.*). Ford states that he was protected by the officer who was escorting him and was not hurt, but complained that his life was "still in serious danger" from being around both Texas Syndicate and Mexican Mafia gang members. (*Id.*). Ford reportedly complained about this incident to Captain Dawson. (*Id.*).

After Ford filed his initial grievance concerning Officer Taylor and her alleged threats against him, Captain Rocker was assigned to investigate Ford's claim of life endangerment. (Doc. # 31, Exhibit C, at 18). During the course of that investigation, Captain Rocker obtained written statements from several officers, including Lieutenant Delarosa, Lieutenant Sanders, Sergeant Newman, and Captain Dawson in connection with his investigation. (*Id.*). Those statements are summarized briefly below.

In his written statement to Captain Rocker, which is dated May 5, 2005, Lieutenant Delarosa reported that he was not aware of any life endangerment situation involving Ford. (Doc. # 31, Exhibit C, at 25). Lieutenant Delarosa stated that he walked the "B line" where Ford was assigned "on a regular basis" and that Ford had never stopped him or stated anything to the effect that his life was in danger. (*Id.*). In addition, Lieutenant Delarosa

19

noted that he had not received a report from any supervisor stating that Ford was in fear for his life.  (*Id.*).

In his written statement, which is dated May 10, 2005, Lieutenant Sanders stated that he received a note from Ford, asking to speak with him.  (Doc. # 31, Exhibit C, at 26).  Lieutenant Sanders observed that the Ford did not give any indication that it was a "life endangerment situation" and the note did not say anything about a threat.  (*Id.*).  When Lieutenant Sanders responded to the note, Ford reportedly asked "what could he do to get transferred closer to home" in Wichita Falls, Texas.  (*Id.*).  According to Lieutenant Sanders, Ford told him that he planned to "file a grievance against several people in order to get transferred" and he asked Sanders "to help him get shipped" to another unit.  (*Id.*).

In his written statement to Captain Rocker, which is dated May 11, 2005, Sergeant Newman reported that he had received a note from Ford asking about the status of his life endangerment investigation.  (Doc. # 31, Exhibit C, at 27).  Sergeant Newman retrieved the note from another officer and gave it to Lieutenant Delarosa, but had no other information about Ford or his situation.  (*Id.*).

Captain Dawson gave a written statement to Captain Rocker on May 10, 2005.  (Doc. # 31, Exhibit C, at 10).  Captain Dawson reportedly observed Ford "banging his head on his cell wall[.]"  (*Id.*).  Captain Dawson called for psychiatric services to examine Ford.  (*Id.*).  During Ford's conversation with a mental health care worker, Captain Dawson heard Ford say "that he was just trying to get shipped" or transferred to another unit.  (*Id.*).  In a separate written statement to Captain Rocker after the assault occurred on May 11, 2005, Captain

Dawson reported that Ford sent him a one-page letter dated May 5, 2005, expressing fear that his life was in danger from the "[Texas Syndicate], [Mexican Mafia], or Crip gang members" who were "out to get [him]" for unspecified reasons. (Doc. # 31, Exhibit C, at 28-29). However, Captain Dawson did not receive the letter until May 12, 2005, after the assault had already occurred and he denied having any information prior to that incident about a threat against Ford by gang members. (*Id.* at 28).

On June 1, 2005, Captain Dawson interviewed Ford concerning the life endangerment claim that he made in his one-page letter dated May 5, 2005. (Doc. # 31, Exhibit C, at 31). During that interview, Ford insisted that he was still in "serious danger" due to the Mexican Mafia and the Texas Syndicate, whose members are trying to kill him. (*Id.*). Ford would not give the names of the inmates who had reportedly threatened him. (*Id.*). Ford did not give any other details about why these gang members wanted to harm him. (*Id.*). Captain Dawson noted that Ford was assaulted on May 11, 2005, by a Texas Syndicate gang member and that the Unit Classification Committee had recommended a transfer. (*Id.*). Captain Dawson concurred with that recommendation and noted that the Darrington Unit was waiting for a response from the State Classification Committee concerning the Unit Committee's request to transfer Ford. (*Id.*).

On June 9, 2005, Captain Rocker filed a report based on his investigation of Ford's written grievance about Officer Taylor's alleged threats. (Doc. # 31, Exhibit C, at 18). Captain Rocker noted that, before his investigation could be completed, Ford was attacked by Moreno in his cell on May 11, 2005. (*Id.* at 18). Captain Rocker concluded that, because

21

Ford was attacked by a Texas Syndicate gang member, he appears to have a problem with members of this gang. (*Id.*). Captain Rocker opined that, as a result of the attack, Ford should be transferred for his safety. (*Id.*).

In addition to the investigation conducted by Captain Rocker regarding Ford's written grievance, Sergeant Ching was assigned to investigate the May 11, 2005 assault on Ford by inmate Moreno. During his investigation, Sergeant Ching learned for the first time that the life endangerment claims asserted by Ford were made in an effort to get a unit transfer in order to avoid or escape debts that Ford owed to gang members at the Darrington Unit. (Doc. # 31, Exhibit C, at 19). Attached to Sergeant Ching's report is a letter from Ford, dated June 7, 2005, in which Ford admitted that he had not been "truthful" in his initial statement to investigators. (*Id.* at 20). In this letter, Ford disclosed that he owed money to the Texas Syndicate and the Mexican Mafia and that the threats he had been receiving stemmed from debts owed to these gang members. (*Id.* at 20-22). This information was not reported to prison officials before the May 11, 2005 assault occurred. Sergeant Ching concluded that Ford's attack could have been the result of his debts. *Id.* at 19. Alternatively, Sergeant Ching concluded that Ford was "inciting other inmates to harm him, in order that his [life endangerment] claims would have a semblance of truth." *Id.* Because Ford was assaulted by a member of the Texas Syndicate, to whom Ford allegedly owed money, Sergeant Ching recommended a unit transfer on June 9, 2005. *Id.* On June 15, 2005, Ford was placed in "transient" status and transferred from the Darrington Unit to the Michael Unit. (Doc. # 31, Exhibit B, at 8, 12, 15).

This record reflects that prison officials actively investigated the threat against Ford by Officer Taylor, which was disclosed in a grievance dated March 29, 2005.  Although the investigation was not completed by the time the assault occurred on May 11, 2005, the record demonstrates that Ford's complaints about threats by staff members were unsupported in the past and were apparently motivated by his desire to transfer to another facility, rather than from a documented risk of harm.[6]  Importantly, Ford was not assigned to the general population when he initiated the life endangerment claims at issue in this case, but was confined to administrative segregation while the investigation was underway.  The Court notes that administrative segregation is the highest level of protective housing that TDCJ can provide inmates.  *See, e.g., Cantu v. Jones*, 293 F.3d 839, 841 (5th Cir. 2002) ("Offenders incarcerated in administrative segregation remain alone in their cells for 23 hours a day and are allowed out of their cells for only one hour of recreation each day followed by a shower."); *Comeaux v. Thaler*, — F. Supp.2d —, —, 2008 WL 818341, at *2 (S.D. Tex. 2008) (noting that " administrative segregation is the most restrictive classification that a TDCJ inmate can have and is reserved for those inmates who are either deemed a serious risk

---

[6]     Before his complaint about Officer Taylor on March 29, 2005, the record shows that Ford made several claims of life endangerment involving staff members.  None of those claims were substantiated.  An investigation of those claims, which were made in November of 2002, January of 2003, and March of 2003, revealed that Ford believed that security at the Darrington Unit was insufficient in general and wanted a transfer.  (Doc. # 31, Exhibit C, at 8-9).  Officials found that Ford was making claims of life endangerment in order to accomplish a unit transfer.  (*Id.*).  Because Ford was unable to provide information or evidence that would lend credibility to his claims, officials declined to transfer him at that time.  (*Id.*).  Officials noted, however, that Ford was currently assigned to administrative segregation, which provided the highest security for his safety.  (*Id.*).

23

to the safety of officers and other inmates or who are confirmed affiliates of a designated Security Threat Group or gang").

In addition, to the extent that there was any serious risk of harm facing Ford prior to the assault on May 11, 2005, Ford did not report the true nature of that threat until June 7, 2005, when Ford disclosed to Sergeant Ching for the first time that he owed money to the Texas Syndicate and the Mexican Mafia.  Under these circumstances, Ford does not raise a genuine issue of material fact on whether prison officials failed to take reasonable steps to protect him from assault by Moreno on May 11, 2005, or that they acted with deliberate indifference to his need for safety.  Accordingly, the Court concludes that Ford has failed to demonstrate a genuine fact issue on whether he suffered constitutional violation under the Eighth Amendment.

### 2.    Objective Reasonableness

Because Ford has failed to establish a constitutional violation, the Court need not proceed to the final step of the qualified immunity analysis.  *See Hathaway v. Bazany*, 507 F.3d 312, 320 (5th Cir. 2007).  Nevertheless, the defendants argue that, even if a violation occurred, they are entitled to qualified immunity from suit because they acted in good faith and their conduct was objectively reasonable under the circumstances. To avoid summary judgment on the defendants' qualified immunity defense, a plaintiff must present evidence to raise a fact issue "material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law *and facts available to them*." *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993), *cert. denied*, 511 U.S.

24

1019 (1994) (emphasis added).  If reasonable public officials could differ as to whether the defendant's actions were lawful, the defendant is entitled to immunity. *See Malley*, 475 U.S. at 341 (1986).  "Even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity if the conduct was objectively reasonable." *Zarnow v. City of Wichita Falls, Tex.*, 500 F.3d 401, 408 (5th Cir. 2007) (quoting *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990)).

Where qualified immunity is asserted, Ford, as the plaintiff, has the burden to produce admissible evidence that raises a genuine issue of material fact on whether the defendants' actions were objectively unreasonable under the circumstances in view of existing law and the facts known to them.  *See Michalik*, 422 F.3d at 262.  Ford does not meet that burden here.  As outlined above, the summary judgment record reflects that Ford filed a written grievance about Officer Taylor and her alleged gang affiliation on March 29, 2005.  Prison officials investigated this grievance along with a second written grievance submitted by Ford on May 5, 2005, but the investigation did not produce evidence of a serious risk of harm until well after the assault occurred on May 11, 2005.  In that respect, the record shows that Ford did not report the fact that he owed money to gang members before the attack, but waited until June 7, 2005 to disclose this fact to Sergeant Ching.  Likewise, it is undisputed that Ford was housed in administrative segregation under heightened security when the incident occurred.  Ford's allegation that the defendants failed to adequately investigate the threat that he first reported on March 29, 2005 does not raise a genuine issue of material fact on whether the actions taken were unreasonable under the circumstances and is not sufficient to

overcome the defendants' assertion of qualified immunity in this instance.  The Court concludes, therefore, that summary judgment on the defendants' assertion of qualified immunity is warranted.

### D.    Remaining Defendant

The Court notes that, of the defendants listed in the complaint, only Officer Barbary remains unserved.  As noted above, Ford failed to exhaust his administrative remedies with respect to his claim that Officer Barbary failed to protect him on the day that the assault occurred because Ford did not present this allegation in his sole step 2 grievance.  (Doc. # 31, Exhibit B, at 1-2).  Ford does not otherwise establish a valid failure-to-protect claim under the Eighth Amendment or allege facts sufficient to overcome the defense of qualified immunity asserted by the other defendants in this case.

The Fifth Circuit has recognized that when one defending party establishes that the plaintiff has no cause of action this defense generally inures also to the benefit of other similarly situated defendants.  *See Lewis v. Lynn*, 236 F.3d 766, 768 (5th Cir. 2001) (quoting *United States v. Peerless Ins. Co.*, 374 F.2d 942, 945 (4th Cir. 1967) (citations omitted)).  The joint motion for summary judgment filed by the defendants in this case disposes of all claims raised in the complaint.  Therefore, the Court dismisses Ford's claims against Officer Barbary under 28 U.S.C. § 1915(e)(2)(B) as without an arguable basis in law.

### IV.    <u>CONCLUSION AND ORDER</u>

Based on the foregoing, the Court **ORDERS** as follows:

1.    The defendants' motion for summary judgment (Doc. # 31) is **GRANTED** and

the plaintiff's cross-motion for summary judgment (Doc. # 32) is **DENIED**.

2.    The complaint in this case is **DISMISSED** with prejudice.

The Clerk is directed to provide a copy of this order to the parties.

SIGNED on July 3rd, 2008.

Nancy F. Atlas
United States District Judge

27